So it's the next case on the roster, which is United States v. Gutierrez, DACA 22-8045. Mr. Moritzen. Welcome. Thank you. Good morning, your honors, and may it please the court, Alan Moritzen for appellant Daniel Gutierrez. Mr. Gutierrez was convicted of four offenses, three of them drug-related, and sentenced to 30 years in prison, based in part on the expert opinions of Agent Ruby regarding the meaning of text messages between Gutierrez and one Joseph Hooker. Counsel, I hate to interrupt you this quick, but I want to be sure that I'm following on your issues 1, 2, 3, and 4. You're under plain error, is that correct? Mr. Gutierrez We are under plain error on the first three issues. Mr. Moritzen Yes, okay. Mr. Gutierrez We are. Mr. Moritzen Now, 4 is the Miller issue that you're Mr. Gutierrez 4 is the constitutionality of the 851. Mr. Moritzen Okay. Well, I just wanted to be sure you and I were on the same page about the standard of review that we've got here. Thank you. Mr. Gutierrez Yes, no problem. We are on the same page, and because it was plain error to allow Agent Ruby to offer his opinions on the meaning of these text messages, Mr. Gutierrez's drug-related convictions should be reversed. Now, let me start with the first prong of the plain error standard, which is error. Agent Ruby was designated as an expert under Rule 702 of the Federal Rules of Evidence. That requires that his opinions be both reliable and relevant. On the reliability front, his opinions have to connect the training or expertise or whatever it is that qualifies him as an expert to the opinions that he reaches. Mr. Moritzen Well, can you specifically state what you object to? What was the text language? What was Agent Ruby's characterization of the language, and why is that plain error to allow that? Mr. Gutierrez So, I would generally direct the Court to pages 14 through 16 of our opening brief. Just for example, the text messages, here in town, by one sender, and the other one saying, where at, and then the other one saying, give me 45, did not require expert opinion  But it wasn't in a vacuum. There was other testimony about what was going on, and he is simply offering expert evidence that comes in every day in drug trials about this coded language, right? In other words, there's nothing too shocking going on here. Mr. Moritzen No, it comes in when the language is coded. Ms. Laird And you're saying the language isn't coded? Mr. Moritzen I invite you to read the text messages. There is no code. Compare it to, for example, United States versus Tehran. You have rack, the word rack, expert testimony, that means $1,000. You have gooey gooey and raindrop, means the process of transforming regular cocaine to crack cocaine. Here you have, I'm on Lincoln Way, well what does that mean? Oh, that he's in Cheyenne. That doesn't require expert opinion. Come in, oh he's inviting him to come in, that kind of stuff. Ms. Laird Part of it does though, I mean, would you just assume the jury knows what a blue is? Mr. Moritzen So as we conceded in one footnote in the opening brief, blue and the price of methamphetamine, a one pound. Ms. Laird A dime, do they know what a dime is? Mr. Moritzen I don't think a dime was used, but maybe I'm misremembering. Ms. Laird I'm looking at a quote from page 48, homeboy it's 5,000, a P anyway you break it, it's not that, it's not making, it's, that's not making a dime and blues are, let me. Mr. Moritzen Well to the extent dime means 10 cents. Ms. Laird Seven a pop, that's cost, but you're, you're my dude. Mr. Moritzen Yeah, so that text message is, is in my opinion the only one that required expert opinion. Mr. Davis Well, does it take two or is one sufficient? Mr. Moritzen Well, when, when an expert then proceeds to provide an overarching incriminating narrative based on an additional 25, 30, 35 text messages. Mr. Davis But one is sufficient and you've got it there, it's stated. Mr. Moritzen Well, Mr. Davis Where I'm taking you to, I'm very concerned we're going to spend a lot of time on error and plain error, but to me prejudice plays a real important part of your, of the third prong of plain error. Ms. Laird Well, so then let me turn to the prejudice question. Ms. Laird Well, and let me, let me couch that a little bit because your argument to us is this was so obvious to the jury. You didn't need an expert because the expert's testimony isn't helpful to the jury because it's obvious. Well, if it's obvious from the actual text, how are you prejudiced? Mr. Moritzen Well, let me clarify if I can. So the problem is that he is offering as expert opinion, the plain meaning of text messages. And then based on that plain meaning, he is drawing inferences about drug activity that lies solely within the realm of the jury's role. So you have this, these text messages that I was describing earlier on Lincoln Way come in and he draws the inference from that that a drug deal occurred during that meeting. Based on what? He's providing a narrative to the jury. He's drawing the inferences on their behalf. So that's... Ms. Laird Well, isn't it obvious from the messages that a drug deal is going on? Mr. Moritzen Well, I'm not, you know, the jury might reach that conclusion, but it's the jury's job to reach that conclusion. And when the government places the imprimatur of an expert testifying that what's obvious is actually what occurred, it deprives the jury of the opportunity to draw that inference for themselves. Mr. Laird Well, on Lincoln Way, there's one street in Wyoming and as far as I know, Colorado that's named Lincoln Way. And so that is important evidence that whatever is being described is in Cheyenne, Wyoming, right? Ms. Laird Right. Mr. Moritzen You don't have a problem with that. Ms. Laird No, I don't. Mr. Moritzen And then if there's other testimony about what was going on that day and what happened the next day as far as drug dealing and so forth, that's relevant, isn't it? Ms. Laird It's not a question of relevance. It's a question of certifying an expert to testify about things that do not require expert  Mr. Laird Okay. Well, back to Judge Baldock's point in prejudice, there's a lot of evidence in this case. There are texts, there's a ledger during a search, there's phone records, there's his own statement about selling occasionally, on and on. How do you ever get to prejudice? Well, the government itself in its opening statement told the jury, Agent Ruby's testimony is going to be essential to your ability to understand the text messages. Then later on, when Agent Ruby's testimony was challenged as cumulative, the government said no, this is the key part of our case. We're going to tie the meaning of these text messages together with Agent Ruby's testimony. Then again, in closing, reemphasize the importance of Agent Ruby's testimony when all he did was draw inferences that the jury should have drawn for itself. That's sufficiently prejudicial to justify reversal. I looked at it. Judge Baldock How is it different from all the other cases in which agents have testified about the meaning of texts and tied it to events that are occurring simultaneously and so forth? Because the expert usually lays the groundwork for the jury to draw the inference. So in the case that I was talking about earlier, the expert comes in and says, okay, when they're using the word rack, that means $1,000. When they're using the word gooey-gooey, that means that they're ... And then the jury has the ability, understanding the evidence, to draw the inference as to whether drug activity occurred. But here, we don't have coded words. We don't have ... I mean, it might be ambiguous. Texts by their nature tend to be ambiguous. But at what point does it require expert opinion is when an expert is required to allow the jury to understand the evidence that's been introduced. At what point there needs to be an objection made by counsel in open court so that the jury can understand at least ... That's why I wanted to establish with you the very beginning our standard of review we've got here. There's no objections made at any time as to these issues. And so that, to me, doubles down on the problem of prejudice. Now, were you trial counsel below? I was not. Okay. Well, see, we try not to shoot the messenger from that standpoint. But that's the problem that ... I'm just being open to you that that's the problem I'm having under our standard of review. Well, if I could just try to convince you that ... Oh, please. It's your time. That the United States ... That the 11th Circuit's opinion in United States versus Hawkins, I think is actually quite close. It's a plain error standard of review. It's an expert, a government expert witness testifying as to the meaning of intercepted wire communications, unobjected to, and the court says you went well beyond the scope of any reasonable expert opinion. And your case, give me that case again. United States versus Hawkins. Hawkins, okay. Out of the 11th Circuit. Right. That's a 2019 decision. And just as in this case, the government came back in its response brief and said, well, no, those are lay opinions that he was sharing, not expert opinions. And the court said, well, A, you talked about him and described him and classified him as an expert, just as happened here. And B, whether he's an expert witness or a lay witness, he can't just sit on the stand  Well, here, if you had made an objection, not you, if trial counsel made an objection, they could have called Urich, what's the other detective's name? I've had a hard time pronouncing that too. Urich, Sergeant Urich, who was a lay witness because he was involved all the way along. And he could have said, I read this message and I understood it to mean, and therefore we did X. I mean, you would have gotten all of the same testimony in through a lay witness if an objection had been made, which it wasn't. I challenge the premise. I don't think we would have gotten the same testimony because these are plain English text messages. So lay witnesses come in and testify when they're police officers certified or qualified by experience or training. We've come to understand over the course of this conversation that when they use the word X, they mean Y. But again... Well, you could do that if you're an expert. All my training and experience, I know when they say a blue, this is what they mean. Or you can have someone who was actually involved in it come in as a lay witness and say, we saw this text message and we acted this way in response to it because we interpreted it to mean X. You could get the same... But the problem is that there wasn't that evidence. There wasn't that testimony. Because there was no objection. If there had been an objection and this Sergeant Ruby or Special Agent Ruby hadn't been able to testify, I assume the prosecution would have done a little shift to get him what they wanted. But you didn't give the judge an opportunity or opposing counsel an opportunity when there's no objection. So in this court's decision in Drain, it draws the distinction between lay witness opinion and expert witness opinion in the context of these drug cases. And lay witness opinion would fall short under these circumstances as well because a lay witness cannot stand up there and narrate plain meaning texts to the jury, drawing inferences on the jury's behalf that the jury should draw for itself. And I'm not suggesting that you put them up there and they just do a narrative. But you can still say, and what did you do in response to that? Right, but these text messages weren't part of the investigation until after the fact. And so... Counsel, you're almost out of time. Before you run, I want to ask you about Miller and the 851 issue as far as serious drug felony. In our circuit, United States v. Rich, we have a case that says juvenile convictions count for enhancing under the ACCA. Why would that not be the case also under 851? Do you have a case or can you give us an explanation within a minute? Well, the only explanation I can offer is the principles that are espoused in Supreme Court precedent about juveniles taking into account characteristics of juveniles in the sentencing process and not precluding district courts from taking into account. And those are basically that the juvenile brain isn't fully formed and that there's a chance for rehabilitation. We're talking someone who's being sentenced for crimes committed as an adult, not as a juvenile. So we've had the history that they had this juvenile crime. We're no longer looking at a juvenile brain. And there's certainly been opportunities for rehabilitation, but they haven't been taken advantage of. Well, it's the opportunities for rehabilitation that I would take issue with, because if we're a juvenile as a 13-year-old and we're institutionalized in an adult facility, I mean, the district court himself said, you know, you've been institutionalized since you were 13. There's been no meaningful opportunity for rehabilitation. At the very least, the district court should have been, should have had the opportunity to consider that in the sentencing process. There are other questions. All right, counsel, thank you for your argument. Ms. Martins. May it please the court, counsel. My name is Christine Martins, and I represent the United States. I think this morning I'd like to begin with the sentencing issue, as that was the only issue that was actually raised to the district court below. So that's actually here on de novo review for this panel. So in our brief, we talk about trying to invoke the principles in Miller v. Alabama and the surrounding cases. Miller is a categorical bar on a mandatory life without parole for juvenile offenders. And when we're looking at this entire line of cases, what it requires is conduct committed as a juvenile for which the juvenile is being sentenced, and it requires that the court be allowed to execute some discretion in sentencing that juvenile. And so when we're looking at Mr. Gutierrez, as this panel has already pointed out, he was before the district court for sentencing for conduct undertaken in his mid-30s, and he was not facing a life without parole sentence. So he simply does not fall within the categorical bars presented by Miller and the surrounding cases. I think that while this court has not squarely addressed this issue with regard to this particular group of statutes, Rich and Orano, the cases cited in the government brief, are helpful. In those cases, the court was faced with a sentencing enhancement under the Armed Career Criminal Act. And particularly, the Armed Career Criminal Act relies on 18 U.S.C. 924E2 to define serious drug felony and violent felony. Now here, for the purpose of the 851, and 851 being the enhancement for having two prior serious drug felonies triggering the 25-year mandatory minimum that attached to count one and count three, that also refers to that very same definition. And that's part of why Orano and Rich are helpful cases. So when we look to those cases, what we find is the Tenth Circuit has pretty resoundingly rejected this argument, pointing to the fact that those offenders were adults when they were being sentenced for their crimes, that they were not facing the sort of mandatory life without parole sentence that's specifically addressed in Miller. And then moving on to the proportionality analysis and finding that in those cases, a mandatory life sentence was not disproportionate for the crimes that were undertaken. So here, Mr. Gutierrez facing 25 to life as an adult recidivist offender cannot plausibly make a claim either that his sentence is disproportionate or that it would somehow violate the Eighth Amendment for the District Court to sentence him in accordance with that recidivist law. I think it's also helpful to note that here, the guideline range applicable to those two counts was 267 to 327 months. Twenty-five years is 300 months. So when we look at that mandatory minimum, it's squarely within the applicable guideline range. And this Court has also said that guideline sentences are presumptively reasonable, which just further emphasizes that there's really no argument that this sentence is disproportionate under the law. And I understand why you say those cases are important and are good analogies. Are there any cases across any of the circuits that have dealt particularly with 851 and Miller? Yes, Your Honor. We cited a case, an out-of-circuit case in the brief that talked about it, and the name of that case is escaping me off the top of my head. But having surveyed the circuits, what I found was that there's really not much depth of analysis in any circuit about this. Essentially, all the circuit courts that I could find have said, look, this particular defendant was an adult. These cases are about juvenile offenders. There's no argument that this is disproportional. And most of the cases dispose of the argument in a paragraph, which was part of why Rich and Orano— I think it was the Fourth and the Eleventh Circuit? Yes, thank you, Your Honor. I do believe that's correct. State v. Crowley and United States v. Hoffman? Yes, Your Honor. Those are precisely the cases, thank you. But most of the cases really dispose of this within a paragraph. What's helpful about Rich and Orano is this court even engaged in some more substantial analysis in those cases and still reached the result that it just simply doesn't apply to an offender like Mr. Gutierrez. Let me ask you this. I know it didn't come up on the first argument, but is it your position that the superseding indictment claim is waived because there was no argument of good faith or good cause in the opening brief here? Yes, Your Honor. We succeed on the challenge to the superseding indictment for two reasons. First, that there was no good cause briefed or shown in any respect. And second, that the record simply means that we cannot presume any vindictiveness here. Mr. Gutierrez was obligated to say why it was that he didn't challenge the superseding indictment on these grounds below, and he hasn't done so. It's also worth noting that neither the Supreme Court nor the Tenth Circuit has ever had a case where we have found prosecutorial vindictiveness in a pretrial setting. In fact, this court has specifically in Creighton in 2017 said that it's perfectly acceptable for the prosecution to add an 851, which is that big sentencing enhancement that at the time, because it was before the First Step Act, took it to a mandatory life sentence when the plea negotiations failed. So here, what the record reveals is that while the superseding indictment came down just a few days after the government's motion for continuance was denied, that in fact the superseding indictment was obtained at the very first opportunity the prosecution had to go back to the grand jury, and that it was the result of the change to prosecution team and the failed plea negotiations. All proper reasons to change and add charges. Why was the district court concerned about that, at least initially? You know, Your Honor, I'm not really sure why it was. I think it could be just sort of the timing. The way that all of this happened was that there were multiple hearings where the court had been alerted that plea negotiations were ongoing, that there may in fact be a superseding indictment. Defendant, on March 8th, actually filed a motion to exclude firearms evidence in light of the fact that the original charge was a single count for a drug distribution conspiracy without the felon in possession of a firearm or the 924C for using firearms for drug conspiracy. So part of what the prosecution was doing was actually seeking to fully moot those motions so there would be no 404B argument later. So the court had heard those things, but the day that the court was in session, there was a James hearing, which is a hearing where we have to go through those hearsay statements of the co-conspirator in the text messages and see whether they're actually in the course of conspiracy to make sure that they come in at trial. So I think the court was maybe focused on that because when we look at the government's 401, there's over 350 messages that were admitted at trial. So there's a good volume of material, we're focused on the task at hand, and then we're just sort of arraigning Mr. Gutierrez on his superseding indictment. So it seems to me that it was just sort of wrapped up in other questions and that maybe the court just wasn't sort of thinking about the longer procedural history with that superseding indictment. Let's turn to the text messages. A lot of those messages were pretty obvious, weren't they? I mean, you didn't need an expert to tell people when he says, I'm here, that means he's here. I think that's fair, Your Honor, but the way that it's been framed in the other side's brief really takes those opinions out of context. Special Agent Ruby was on the stand twice in this case. He testified toward the beginning to just give some overall education to the jury about drug organizations, some typical naming conventions and like, you know, blues and price for drugs and those sorts of things. And they don't object to that? No, not at all. There was no objection at trial to any of the opinions. And in fact, there was one objection, but the objection was to the cumulative nature of the evidence when Special Agent Ruby retook the stand. So what had happened was is Sergeant Adam Yorick had testified as the investigating officer and he, being relatively new to drug cases, was uncomfortable being an expert and wasn't designated as one. So one of the reasons the government sought a continuance was the unavailability of our original expert and Special Agent Ruby got subbed in kind of at the last minute to get this case to trial in light of the denial of that motion for continuance. So what happens is Special Agent Ruby, who has no overarching knowledge of this case, sits in the courtroom, observes the testimony, so his knowledge is only based on his training and experience and admissible evidence that the jury has received, and we call him to the stand. Well, and I have a bit of a problem with that. I mean, it's fine for him to testify as to his training and experience, but for him to give an opinion about the testimony that has been heard, I mean, that does seem to be invading the provenance of the jury. Well, Your Honor, it would only be objectionable for an expert to opine if they say, opine on the credibility of another witness. But we employ experts regularly to draw inferences for the jury. So here, when we're looking at the opinions he was actually offering, is what he was being asked to do was to look at these text messages and help the jury navigate them so that they could figure out on what days and times drug deals had occurred, the locations of those drug deals that had occurred, and the amount and price of the controlled substances exchanged at those deals. The point of the testimony was not that the text message, come in, means come in. The opinion was, a meeting occurred, and the explanation that followed was, how can you tell? Well, you see this text message here says, come in, is part of the explanation for why the expert says a meeting occurred at that date and time. Well, I mean, assuming that your jury had IQs in double digits, does anyone have to tell them? I mean, that's the argument, is that, let the jury figure it out reading the text messages. And I see a big difference between seeing, in my experience as an expert, when drug dealers don't like to refer to guns by saying gun, and so they use other terms like thingy. And then stop there and let the jury see the word thingy in the text message and make its own inference that they're talking about a gun. Do you see a difference there? I do, Your Honor. And you see no problem with your expert saying, right here, this is what this means, and he paid this much for it, and this is what he bought. I do not. So when we look at this court's cases, what we see is that we allow experts to draw inferences right up to the limits of Rule 704. So Rule 704 tells us that it's perfectly fine for an expert's testimony to embrace ultimate issues, and then in Subsection B, the limit on that is the expert's testimony cannot go to the intent in the defendant's mind at the moment of the act. And in the government's brief, we've cited Durain, which is a 2022 case from this court that talks about the limits of that expert testimony. In that case, the drug expert said, that's definitely a distribution quantity of the defendant's evidence that he was essentially holding. And there, he argued that that amounted to going all the way to the unpermitted inference that he must have intended to distribute if it's definitely a distribution quantity. And the court said that that opinion was okay, that it's all right for experts to draw all of those inferences right up to that line under 704B. So here, that's exactly what the government is doing, is using its expert to draw those inferences, and the expert is simply explaining how it is that the jury can draw those conclusions for themselves. Mr. Gutierrez complains about the groundwork for these inferences, or the opinions, but the text messages that he's citing is really the groundwork for the opinions that were the thrust of the testimony. Furthermore, there was an objection when we started going back through these text messages that this was cumulative. And what we see here is that in the beginning of this testimony, it's very methodical. You know, this is based on your training and experience, let's explain it, let's really walk the jury through it, then defense counsel objects, cumulative, and the prosecutor is actually sort of scolded at the bench by the district court judge about being very slow. And the court would find that on page 681 of our transcripts in this case. So essentially, this bench conference says, yeah, that's fine, just get to the opinions. Our defense counsel is saying, just get to the opinions and skip the explanation, because it's going so slow. So to the extent that Mr. Gutierrez now wants to complain that these opinions were not sufficiently explained, it's all but invited error. And again, we're here on plain error review. And Mr. Gutierrez, as part of satisfying that standard, must point to a case either by the Supreme Court or the Tenth Circuit that actually says that this was obvious and should have been obvious to the judge, so much so that he should have stopped this testimony. But he has cited no such case in his brief, and I can find none. To the contrary, we're looking at cases like Cushing and Durain, where this court has approved of those inferences, even if, after the fact, we really think the evidence was just so good that the jury could have got there on their own. All right. Thank you, counsel. Thank you both for your helpful arguments. The case is submitted, and counsel are excused.